IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| INFINITE FINANCIAL SOLUTIONS, INC., *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:14-CV-354-N |
| STRUKMYER, LLC, *et al.*, | § § | |
| Defendants. | § § | |

## ORDER

This Order addresses Plaintiffs Infinite Financial Solutions, Inc. ("Infinite"), Silver Eagle Labs, Inc. ("SEL, Inc."), and NicoSpan, Inc.'s ("NicoSpan") motion for a preliminary injunction [Doc. 14] and Defendants Strukmyer, LLC ("Strukmyer"), Silver Eagle Labs NV, LLC ("SEL NV"), Silver Eagle Labs, LLC's ("SEL TX") motion to dismiss [56]. The Court finds that Plaintiffs have satisfied federal pleading standards but fail to show a likelihood of success on the merits. The Court therefore denies both motions.[1]

---

[1]This Order also addresses Defendants' motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim [25]. Because Plaintiffs addressed the issues raised in that motion in their amended complaint, the Court denies the motion as moot.

ORDER – PAGE 1

## I. THE PATENT DISPUTE

Infinite, a Nevada corporation owned and controlled by Michelle Lockwood, was the parent and sole shareholder of SEL NV and SEL, Inc. until July 2013.[2]  Plaintiffs allege that Infinite owns U.S. Patent No. 7,114,495 B2, which covers certain nasal strips (the " '495 Patent"), and trade secrets related to a dog bone design nasal strip.  Plaintiffs also allege that Infinite owns trademarks in NicoSpan, a nicotine delivery strip.

In 2008, Brady Medical ("Brady") contracted with SEL, Inc. to manufacture nasal strips for SEL NV and SEL, Inc. (the "Manufacturing Agreement").[3]  The parties automatically renewed the Manufacturing Agreement until June 2013.  By July 2012, Infinite and the SEL entities fell behind on payments.  Infinite converted the debt to a promissory note in the amount owed payable to Brady (the "Note").  To secure the Note, Infinite pledged its ownership interests in SEL NV and SEL, Inc.[4]

Strukmyer, a Texas company that manufactures, distributes, and sells medical products, purchased Brady in August 2012 and received an assignment of the Note.

---

[2]The Court draws these alleged facts from Plaintiffs' amended complaint [44] and the parties' briefs.

[3]The parties dispute the extent to which each of the SEL entities was involved in manufacturing the nasal strips pursuant to the Manufacturing Agreement.  Plaintiffs allege that only SEL, Inc. was involved in providing the specifications to Brady and making payments.  Defendants claim that both SEL NV and SEL, Inc. were involved.

[4]The initial security agreement stated that Michelle Lockwood owned 100 percent of SEL NV.  Infinite was actually the sole member, and the parties amended the security agreement to reflect that Infinite pledges all of its ownership interests as security for the Note.

Strukmyer continued to manufacture the nasal strips pursuant to the Manufacturing Agreement. Infinite and the SEL entities, still unable to pay, signed several extensions with Strukmyer. In the fourth extension agreement, SEL NV and SEL, Inc. granted Strukmyer control of the SEL entities' bank account that received revenues.

In June 2013, Strukmyer began foreclosure proceedings on Infinite's ownership interests in SEL NV and SEL, Inc. Strukmyer took over both of the SEL entities, but later returned the stock of SEL, Inc. to Infinite. Plaintiffs allege that Defendants, during their possession of SEL, Inc., looted the company and misappropriated trade secrets belonging to SEL, Inc.

Plaintiffs initiated this suit on August 29, 2013, in the District of Nevada. The Nevada court later transferred the case to this Court. Plaintiffs now move for a preliminary injunction barring Defendants from utilizing patented technology, trademarks, and trade secrets associated with certain nasal strips, nicotine strips, and software. Defendants also move to dismiss several of Plaintiffs' claims.

## II. PLAINTIFFS' AMENDED COMPLAINT SATISFIES PLEADING STANDARDS

Defendants argue that Plaintiffs' second through sixth claims, as put forth in their Amended Complaint, are deficient and fail to meet federal pleading standards. The Court finds that Plaintiffs have alleged sufficient factual content to support each of these claims, however. The Court therefore denies Defendants' motion.

## A.  Standard for Dismissal

When considering a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).  But a court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (citation omitted). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

## B.  Misappropriation of Trade Secrets

The elements of misappropriation under Nevada law[5] are: "(1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was

---

[5]The parties agree that Nevada law applies to the state claims.

made in breach of an express or implied contract or by a party with a duty not to disclose."

*Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).  Misappropriation is the:

> (a) Acquisition of the trade secret of another by a person by improper means;
> (b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (c) Disclosure or use of a trade secret of another without express or implied consent . . . .

Nev. Rev. Stat. § 600A.030.

Plaintiffs allege that Defendants misappropriated trade secrets relating to the SEL, Inc. dog bone nasal strip.  *See* Am. Compl. ¶¶ 20, 74–75.  Defendants argue that the claim fails for three reasons.  First, Defendants argue that they cannot, by law, misappropriate trade secrets that belong to them.  Defendants construe Plaintiffs' amended complaint to allege that the misappropriation occurred while Strukmyer held the stock certificate for SEL, Inc.  *See* Defs.' Mot. 10.  Thus, Defendants contend they could not have acquired the trade secrets "by improper means."  *Id.*  But Defendants misstate the allegations in Plaintiffs' amended complaint.  Plaintiffs allege, in part, that Defendants improperly retained the assets, including the trade secrets, after they vacated control of SEL, Inc.  *See* Am. Compl. ¶ 48.  Because Plaintiffs allege that Defendants lacked authorization to retain the trade secrets *after* possession, Defendants' argument fails.

Next, Defendants argue that Plaintiffs fail to state that Defendants' alleged use of the trade secrets was without consent.  *See* Defs.' Mot. 10.  To the contrary, Plaintiffs allege at multiple points in their amended complaint that Defendants lacked authorization to use the trade secrets.  *See* Am. Compl. ¶¶ 21, 63.  Therefore, this argument also fails.

ORDER – PAGE 5

Finally, Defendants argue that Plaintiffs waived any claims against Strukmyer arising from its administration of the SEL entities in the security and extensions agreement executed in connection with the Note.  *See* Defs.' Mot. 10–11.  The security agreement states, in relevant part, the "Guarantor hereby further waives and releases all claims, causes of action, defenses and offsets for any act or omission of Lender, its directors, officers, employees, representatives or agents in connection with Lender's administration of the Guaranteed Indebtedness, except for Lender's willful misconduct and gross negligence."  *See* Defs.' Request Judicial Notice, Ex. 6, ¶ 4(d) [27].[6]  Plaintiffs contend that "Guaranteed Indebtedness" refers to an amount owed by SEL NV, not SEL, Inc., and thus does not waive claims related to the operation of SEL, Inc.  Pls.' Resp. 7 [87].[7]  The Court also questions whether the "administration of the Guaranteed Indebtedness" includes the post-foreclosure operation of SEL, Inc.  But, even assuming "Guaranteed Indebtedness" does apply to Defendants' operation of SEL, Inc., Plaintiffs' claim may fall within the waiver provision. Nevada recognizes exemplary damages for "willful, wanton or reckless misappropriation," NEV. REV. STAT. § 600A.050(2), and Plaintiffs have alleged in their complaint that

---

[6]Courts may reference materials attached to the pleadings, including documents attached to a motion to dismiss, so long as they "are referred to in the plaintiff's complaint and are central to her claim."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Plaintiffs refer to several documents, including the Note, security interests asserted in connection with the Note, and extensions of the Note.  *See* Am. Compl. ¶¶ 31, 33, 34.  As the contractual history between the parties is central to Plaintiffs' claims, the Court takes judicial notice of the security agreement and the Note extensions.

[7]The security agreement defines "Borrower" as SEL NV but defines "Guarantor" as SEL, Inc.  *See id.* ¶ 1.

ORDER – PAGE 6

Defendants acted with malice, oppression, or fraud, *see* Am. Compl. ¶ 75. Plaintiffs' misappropriation claim may therefore fall within the "willful misconduct" exception. *Cf. Gines*, 699 F.3d at 816 (observing that courts should construe facts in light most favorable to plaintiff on a motion to dismiss). Additionally, the extension agreement giving Defendants control of the SEL, Inc. bank account specifically relates to the operation of the bank accounts, which is not at issue in Plaintiffs' misappropriation claim. *Id.* at Ex. 9, ¶ 5. Thus, neither agreement precludes Plaintiffs' misappropriation claim.

As each of Defendants' arguments fails, the Court holds that Plaintiffs have adequately alleged a claim for misappropriation of trade secrets.

### C. Intentional Interference with Contractual Relations and Prospective Economic Advantage

To state a claim for intentional interference with contractual relations, Plaintiffs must allege that (1) there was a valid and existing contract; (2) the defendant knew of the contract; (3) the defendant undertook intentional acts intended or designed to disrupt the contractual relationship; (4) the defendant did disrupt the contract; and (5) damages. *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). A claim for intentional interference with a prospective economic advantage involves a similar showing: Plaintiffs must allege (1) a prospective contractual relationship between the plaintiff and a thirty party; (2) defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of defendant's conduct. *Consol. Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1255 (Nev. 1998).

Defendants contend that Plaintiffs do not specifically allege any contractual relationship or protected economic expectancy with which Defendants interfered and that Plaintiffs base these claims on the same facts as their misappropriation claim. *See* Defs.' Mot. 12. To the contrary, Plaintiffs allege that Defendants interfered with (1) existing contracts between SEL, Inc. and other parties, including Tradiphar and Horcasitas de las Fuente y Asociados, *see* Am. Compl. ¶ 84, and (2) prospective contracts between SEL, Inc. and its customers, *id.* ¶¶ 77–78. Further, these claims do not rely on the same allegations as Plaintiffs' misappropriation claim. Plaintiffs allege that Defendants canceled existing contracts, dismantled SEL, Inc.'s website, and solicited its existing customers. *Id.* ¶¶ 44, 78–79. These allegations are sufficient to state a claim for intentional interference under both theories.

### D. Breach of Fiduciary Duty

The basic elements of a fiduciary duty claim under Nevada law are (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) a causal link between the breach and the damages suffered by the plaintiff. *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008).

Defendants challenge Plaintiffs' allegations regarding the first element. Defendants contend that they were at no point directors or officers of SEL, Inc. and thus owed no fiduciary duty to SEL, Inc. Defs.' Mot. 13. Nevada law does not limit fiduciary duties to these categories, however. "A fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party." *Hoopes v. Hammargren*, 725 P.2d 238, 242

(Nev. 1986).  Nevada courts have recognized fiduciary relationships between an insurer and its insured; attorney and client; spouses; fiances; and doctor and patient.  *See Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007) (collecting cases).  An owner or controlling shareholder also owes a corporation a fiduciary duty.  *Cf. In re Windspire Energy, Inc.*, 2014 WL 763514, at *7 (D. Nev. 2014) (" '[A] shareholder owes a fiduciary duty only if it maintains a majority interest in or exercises control over the business affairs of the corporation.'  A minority shareholder may be a controlling shareholder, and therefore owe the corporation a fiduciary duty, however." (quoting *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987))); *see also Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) ("The parties agree controlling shareholders owe a fiduciary duty to the minority shareholders.").  For relationships outside these categories, Nevada law "recognizes a duty owed in 'confidential relationships,' where 'one party gains the confidence of the other and purports to act or advise with the other's interest in mind.'  The duty owed is comparable to a fiduciary duty." *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007).

Plaintiffs allege that Defendants owed SEL, Inc. a fiduciary duty "as a result of their ownership, control, and management" of SEL, Inc. during the time that they held the stock certificate of the company.  *See* Pls.' Resp. 10; *see also* Am. Compl. ¶¶ 11 (Delk acted as actual or *de facto* officer, director, or manager of SEL, Inc.); 42 (Delk stated that he owed SEL, Inc. a fiduciary duty); 49 (Defendants took assets while asserting ownership and control

over SEL, Inc.).  The Court finds these allegations sufficient to maintain Plaintiffs' breach of fiduciary duty claim at this stage in the case.[8]

### E. Unjust Enrichment and Conversion

To state an unjust enrichment claim, Plaintiffs must allege "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and the acceptance and retention by the defendant of such benefit." *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992).  Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or right." *M.C. Multi-Family Dev., L.L.C. v. Crestdale Associates, Ltd.*, 193 P.3d 536, 542 (Nev. 2008).

Defendants argue that Plaintiffs' unjust enrichment and conversion claims are redundant of their misappropriation claim and thus are precluded under NEV. REV. STAT. 600A.090.  *See* Defs.' Mot. 14.  Again, however, they misconstrue Plaintiffs' allegations. Plaintiffs allege that Defendants appropriated SEL, Inc.'s inventory, copyrighted artwork and designs, and funds from SEL, Inc.'s bank account.  *See* Am. Compl. ¶ 44.  Thus, acts other than Defendants' misappropriation of trade secrets form the basis of Plaintiffs' unjust enrichment and conversion claims.

Defendants also argue that Strukmyer owned SEL, Inc. at the time that it allegedly appropriated SEL, Inc.'s property and thus cannot have wrongfully exercised control over

---

[8]Defendants also contend that even if a fiduciary duty existed, Plaintiffs waived claims against Defendants in the security agreement and bank account operation agreement. *See* Defs.' Mot. 13–14.  This argument fails for the reasons discussed in Section II.B.

the property.  *See* Defs.' Mot. 14–15.  For the same reasons discussed with respect to the misappropriation claim, *see supra* Section II.B, this argument fails.  The Court holds that Plaintiffs have adequately stated claims for conversion and unjust enrichment.

### F.  Declaratory Relief

The Declaratory Judgment Act (the "DJA") allows a federal court to "declare the rights and other legal relations of any interested party seeking such declaration" provided there is an "actual controversy."  28 U.S.C. § 2201.  Thus, there must first be a justiciable controversy for the DJA to provide relief.  *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40 (1937).  "[T]he proper test for subject matter jurisdiction in a declaratory judgment action is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' "  *Tradebay, LLC v. eBay, Inc.*, 278 F.R.D. 597, 604 (D. Nev. 2011) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).[9]

_____

[9]Before *MedImmune*, the Federal Circuit had applied a two prong test to determine whether an actual controversy existed in trademark cases.  First, "the declaratory plaintiff must have a real and reasonable apprehension of litigation."  *Windsurfing Int'l Inc. v. AMF Inc.*, 828 F.2d 755, 757–58 (Fed. Cir. 1987).  And, second, "the declaratory plaintiff must have engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant."  *Id.*  The Supreme Court overruled the "reasonable apprehension of suit" test in *MedImmune*, finding that it conflicted with several earlier Supreme Court decisions.  *MedImmune*, 549 U.S. at 132 n.11.  The Court thus considers the totality of the circumstances to evaluate Plaintiffs' claim.

Plaintiffs request a declaratory judgment regarding the rights of the parties to the NicoSpan trademark, products, and other related intellectual property. *See* Am. Compl. ¶ 101. In their complaint, Plaintiffs allege that Infinite currently holds the NicoSpan trademark. *Id.* ¶¶ 25–26. Plaintiffs allege that Defendants, while holding SEL, Inc. and SEL NV, asserted an ownership interest in the NicoSpan trademark and took control over the NicoSpan website and inventory. *Id.* ¶ 64. Though Defendants argue that there is no actual controversy, Defendants filed a separate state court action, which has since been consolidated with this action, seeking an injunction barring Plaintiffs from asserting ownership of NicoSpan. *See* Notice of Removal [63].

Defendants argue that they own the NicoSpan trademark because the purported assignment from SEL NV, which Defendants own, to Infinite was void. *See* Def.'s Mot. 19. Though assignment of a trademark need not be recorded to be effective, an assignment is "void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office [("PTO")] within 3 months after the date of the assignment or prior to the subsequent purchase." 15 U.S.C. § 1060. According to Plaintiffs' complaint, SEL NV assigned its interest in the NicoSpan trademark to Infinite in May 12, 2011. *See* Am. Compl. ¶ 26. No one recorded the assignment with the PTO until August 2013. *See* Am. Compl., Ex. 7 [44-1].[10] In the interim, according to the amended complaint, Infinite pledged its

---

[10]In considering a motion to dismiss, a Court considers the contents of the pleadings, including the attachments thereto. *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 661

ownership interests in SEL NV as security for the Note, and Strukmyer foreclosed on Infinite's stock in SEL NV and took ownership of the company and its assets. *See* Defs.' Mot. 19. Taking these alleged facts as true, the NicoSpan trademark was not an asset of SEL NV at the time the company was pledged as a security for the Note or at the time Strukmyer took ownership. Thus, Defendants have not shown that there was a subsequent purchase of the trademark that would void the unrecorded assignment. As both parties assert ownership over the trademark and have initiated lawsuits to enforce their ownership, the Court finds that Plaintiffs have adequately stated a claim for a declaratory judgment.

### III. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

In their motion for a preliminary injunction, Plaintiffs seek to enjoin Defendants from exploiting certain technologies allegedly subject to patent, trademark, or trade secret protection and from utilizing an electronic data interchange program ("EDI") allegedly owned by Plaintiffs. Though Plaintiffs' amended complaint satisfies federal pleading standards, they have not shown a substantial likelihood of success on the merits of their claims. The Court holds that Plaintiffs are not entitled to a preliminary injunction and denies their motion.

---

(N.D. Tex. 2011) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

### A.  *Standard for a Preliminary Injunction*

To obtain a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood that it will ultimately prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the preliminary injunction is denied; (3) that the potential injury to Plaintiffs outweighs whatever damage the proposed injunction may cause Defendants; and (4) that granting the preliminary injunction will not disserve the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).[11] "[T]he decision to grant or deny a preliminary injunction lies within the sound discretion of the district court."  *Energy Dev. Corp. v. St. Martin*, 112 F. App'x 952, 957 (5th Cir. 2004) (unpub.).  A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999).

### B.  *Patent Infringement*

The elements of a patent infringement claim are (1) a valid patent exists and (2) Defendants infringed on the patent "either literally or by substantial equivalent."  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999).  "For a patentee

---

[11]Plaintiffs ask the Court to evaluate their motion under an alternate preliminary injunction test, which considers whether Plaintiffs have shown a "probable success on the merits and the possibility of irreparable injury."  Pls.' Mot. 13–14 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839–40 (9th Cir. 2001)).  As the Court finds that Plaintiffs have not shown a likelihood of success on the merits – either probable or substantial – on any of the asserted claims, the Court's analysis under either standard is the same.

to establish that it is likely to succeed on the merits, it 'must demonstrate that it will likely prove infringement of one or more claims of the patent-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer.' " *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)). "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, i.e., the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit." *Id.* (citation omitted).

The parties do not dispute the validity of the '495 Patent. Thus, the Court begins with the second element. There are two steps to determine whether an accused device infringes on a valid patent. First, the Court construes the claim. *Conceal City, L.L.C. v. Looper Law Enforcement, LLC*, 2011 WL 5557421, at *2 (N.D. Tex. 2011) (citing *Amazon.com*, 239 F.3d at 1351). Second, the Court compares the construed claim with the accused device. *Id.*

Claim construction is a question of law for the Court. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). In construing the claims of a patent, the words comprising the claims "are generally given their ordinary and customary meaning" as understood by "a person of ordinary skill in the art in question at the time of the invention" who reads the claim terms "in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). If the specification "reveal[s] a special definition given to a claim term," the special definition

applies. *Id.* at 1316.  Likewise, if "the specification . . . reveal[s] an intentional disclaimer, or disavowal, of claim scope by the inventor," the Court regards the "inventor's invention, as expressed in the specification," as dispositive. *Id.*  The Court also examines the patent's prosecution history, including the "complete record of the proceedings before the PTO and . . . the prior art cited during the examination of the patent." *Id.* at 1317.  In particular, the Court looks to the prosecution history to determine "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*  Finally, in addition to evidence intrinsic to the patent-in-suit and its prosecution history, courts may consider extrinsic evidence, which includes "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  The Court considers extrinsic evidence less reliable than intrinsic evidence in defining claim terms. *Id.* at 1318.

The principle dispute relates to the meaning of "a truss of a single body with a resilient member secured therein." *See* '495 Patent col.7 (filed May 5, 2004) [14-7].  Defendants argue that the phrase "secured therein" indicates that the Patent is directed to nasal strips with a resilient membrane secured between two layers (for a total of three layers). *See* Defs.' Resp. 14–15 [41].  Because their strip only has two layers, they contend that it does not infringe on the Patent. *Id.*[12]  Plaintiffs counter that while a three layer design may be the preferred embodiment, the language in Claim 1 does not limit protection to that

---

[12]Defendants also contend they have not infringed on the Patent because they have only produced nasal strips pursuant to the Manufacturing Agreement. *See* Defs.' Resp. 1.

ORDER – PAGE 16

design.  *See* Pls.' Reply 8–9 [80].  Plaintiffs claim that Claim 1 of the Patent protects a tapered string design regardless of the number of layers.  *Id.* at 10.

Claim 1 describes, in relevant part, a "nasal dilator capable of introducing separating stresses in nasal outer wall tissues comprising: a truss of a single body with a resilient member secured therein . . . ." '495 Patent col.7 ll.42–46.  Whether the Patent protects only a three layer design depends on the meaning of "truss" and "secured therein," terms which, in isolation, shed little light on the question.  The Oxford English Dictionary defines "truss" as "a collection of things bound together." *Oxford English Dictionary Online*, www.oed.com (last visited July 2, 2014).  "Therein" means "in that place or (material) thing." *Id.*  Both definitions are equally consistent with the Plaintiffs and Defendants' interpretations.

As Defendants point out, several sections of the Patent favor a three layer design.  The preferred embodiment section states that the "nasal dilator is a truss assembly which includes the top cover which has the resilient band attached at the center of the bottom surface." '495 Patent col.6 ll.29–34.  Figure 2 shows a three layer strip (top, resilient band, cushion layer) with the backing strip.  *See id.*, Fig. 2.  Claim 15 refers to a "unitary truss member" that includes a top layer, resilient band, and a cushion layer.  *Id.* col.8 ll.36–47.  Claim 16 also describes a three-layer "unitary truss member."  *Id.* col.8 ll.51–67.  Elsewhere, the specification emphasizes the importance of the third "cushion" layer as an improvement on prior art.  The specification states that the nasal strip improves upon an earlier Spanish patent granted to Miguel Angel Aviles Iriarti (the "Iriarti Patent")  in three ways.  First, it has "a resilient band which has a variable spring rate."  '495 Patent col.1 ll.42–46.  Second, it has

ORDER – PAGE 17

"a concave indent on one side of the dilator and a convex protrusion on the opposite side."
*Id.* col.1 ll.47–51. And, third, it uses "a soft fabric cushion with adhesive on both sides to prevent the resilient band from coming in contact with the users skin. This soft fabric cushion is the same size as the top soft fabric cover." *Id.* col.1 ll.52–56. The third improvement on the prior art thus contemplates three layers: a soft fabric cushion, a resilient band, and a top soft fabric cover. It "make[s] the dilator more comfortable for the user as compared to prior art dilators in general and the Iriarti dilator in particular." *Id.* col.4 ll.31–34. The specification notes that the Iriarti dilator involved a "two-piece" design. *Id.* col.1 ll.22–26 ("[E]ach end is attached to the soft tissue on the lateral wall of the nasal passage using the adhesive on the soft fabric cover that extends beyond the edge of the resilient band."). Thus, the Patent distinguishes this prior art based, in part, on the number of layers.

Plaintiffs correctly note that the description of the preferred embodiment does not limit the scope of the invention. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[The Federal Circuit] has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); *see also,* col.7 ll.38–40 ("The description of the preferred embodiment described herein is not intended to limit the scope of the invention, which is properly set out in the claims."). Nor does the specification necessarily limit the Patent's claims. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed.Cir. 1985) (en banc) ("[C]laims are construable . . . in light of the specification, yet '[t]hat claims are

interpreted in light of the specification does not mean that everything expressed in the specification must be read into all of the claims.' " (quoting *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983))).  Nonetheless, Defendants raise a substantial question as to whether the Patent covers their two layer design.  Accordingly, Plaintiffs have not shown a likelihood of success on their claim that Defendants' product infringes the '495 Patent.[13]  The Court will revisit this issue at the claim construction phase with the benefit of full briefing.

### *C.  Misappropriation of Trade Secrets*

A trade secret is "information that '[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public,' as well as information that '[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' " *Finkel v. Cashman Prof'l, Inc.*, 270 P.3d 1259, 1264 (Nev. 2012) (alterations in original) (quoting NEV. REV. STAT. 600A.030(5)(a)–(b)).  Courts consider several factors in determining whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business and the ease or difficulty with which the acquired information could be properly

---

[13]Plaintiffs also assert the "doctrine of equivalents test," under which infringement is found if an element of the offending product "performs substantially the same function in substantially the same way to obtain the same result as an element of the protected invention." *Siemens Med Solutions USA, Inc. v. Saint-Gotain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011).  Plaintiffs do not undertake this analysis, however, focusing instead on their argument that Defendants have produced an identical product. *See* Pls.' Mot. 21–22.  Thus, Plaintiffs also fail to show a likelihood of success on their patent infringement claim under the doctrine of equivalents test.

acquired by others; (2) whether the information was confidential or secret; (3) the extent and manner in which the employer guarded the secrecy of the information; and (4) the former employee's knowledge of customer's buying habits and other customer data and whether this information is known by the employer's competitors. . . .

*Id.* (quoting *Frantz v. Johnson*, 999 P.2d 351, 358–59 (Nev. 2000)).

Plaintiffs allege that Defendants misappropriated trade secrets related to a dog bone-shaped nasal strip. The specific trade secrets Plaintiffs accuse Defendants of wrongfully taking is:

Information regarding the process for manufacturing the SEL INC dog bone nasal strip design, special dimensions, adhesives and materials used, packaging materials used, packaging process, sales and marketing information, customer lists, and other matters which are exclusively within the ownership of SEL INC with respect to the SEL INC dog bone nasal strip design.

Pls.' Reply 14. Plaintiffs cite the Declaration of Michelle Lockwood, which states that SEL, Inc. has made reasonable efforts to maintain the secrecy of these trade secrets. *See* Pls.' Mot., Ex. 1 ¶¶ 21–23.

At this stage of the case, these facts are insufficient to show that any protected trade secrets exist. First, many of the categories listed by Plaintiffs are broad and indefinite. The phrase "packaging materials used," for example, does not inform the Court what feature of the packaging materials is a trade secret. A simple cardboard box is "generally known" and likely not a trade secret, but other types of packaging materials might warrant protection. Without more specific information, the Court cannot determine whether these features are actually protectable. Plaintiffs also fail to provide factual content to support their general allegations that the alleged trade secrets were in fact secret. In *Finkel v. Cashman Prof'l,*

ORDER – PAGE 20

*Inc.*, the Nevada Supreme Court considered specific aspects of the parties' treatment of the alleged information – a customer list – to find that the parties maintained the secrecy of the information:

> The record indicates that pricing schemes were kept confidential, the point-of-sale software was not shared with anyone outside the business, and [Plaintiff] required its employees to keep business-related information confidential. Moreover, [Plaintiff] went to extreme measures to protect its customer information, as only four people had access to its contracts and customer data.

*Finkel*, 270 P.3d at 1264.  Other than stating generally they have made efforts to maintain the secrecy of the information, Plaintiffs have not informed the Court of the basis for this statement.  Without such information, Plaintiffs fail to show a likelihood of success on the merits of this claim.

### D.  Trademark Infringement

Plaintiffs also ask the Court to enjoin Defendants from infringing upon NicoSpan technology and the NicoSpan and NasalAid trademarks.  *See* Pls.' Mot. 2–3, 24.  Though Plaintiffs assert a claim for a declaratory judgment regarding the parties' rights to NicoSpan intellectual property, they do not state claims for trademark infringement relating to NicoSpan in their complaint.  *See* Am. Compl. ¶ 101.  They state no claims relating to the NasalAid trademark.  These claims are not properly before the Court.

"Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."  *Adair v. England*, 193 F. Supp. 2d 196, 200 (D. D.C. 2002)

(citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994); *Stewart v. U.S. Immigration and Naturalization Serv.*, 762 F.2d 193, 198–99 (2d Cir. 1985)); *see also PCI Transp., Inc. v. Fort Worth & Western R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005) (affirming district court's denial of a preliminary injunction where claim was not presented to the court).  The Court plainly does not have jurisdiction to hear the NasalAid trademark claim as no such claim has been asserted in the amended complaint.  And Plaintiffs' declaratory judgment claim relating to NicoSpan intellectual property is a dispute over ownership rights and not one arising under trademark or patent law.  *Cf. Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("It is well settled that if the patentee pleads a cause of action based on rights created by a contract, or on the common law of torts, the case is not one 'arising under' the patent laws."); *Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 619 (4th Cir. 1997) ("The Lanham Act is designed to address the registration and infringement of trademarks, not ownership disputes arising out of contracts.").  Accordingly, Plaintiffs are not entitled to a preliminary injunction as to these claims.

### E.  Theft of the EDI Program and Website

Finally, Plaintiffs ask the Court to enjoin Defendants from using the EDI program or interfering with SEL, Inc.'s website. Pls.' Mot. 3.  Though Plaintiffs do not specifically state as much, the Court presumes their request for injunctive relief relating to the program and website arises from their conversion claim.  "Conversion is a distinct act of dominion wrongfully exerted over personal property in denial of, or inconsistent with, title or rights therein or in derogation, exclusion or defiance of such rights."  *Edwards v. Emperor's*

*Garden Rest.*, 130 P.3d 1280, 1287 (Nev. 2006).  Plaintiffs fail to present evidence that they hold the title or rights in the program or website.  For example, Plaintiffs provide two contracts relating to the EDI program purporting to show that SEL, Inc., and not SEL NV, was a party to the contract.  *See* Pls.' Reply 16.  But the contracts are ambiguous, however; the customer is listed as "Silver Eagle Labs."  *See* Pls. Mot., Ex. 44.  And while EDI's maker confirmed with Michelle Lockwood that "Silver Eagle Labs, Inc." was the listed contact on the account, there is no evidence that the maker understood the distinction between SEL, Inc. and SEL NV.  *Id.*, Ex. 45.  Further, Plaintiffs have not presented evidence, other than the Declaration of Michelle Lockwood, that SEL, Inc. owned the website.  *Id.*, Ex. 1 ¶ 68. Defendants present the Declaration of Robert Delk stating that he believed the website belonged to SEL NV.  *See* Defs.' Resp., Ex. 1 ¶ 27.  On balance, the Court finds Plaintiffs' evidence insufficient to show that they own the EDI program or website.  As Plaintiffs must have a title or rights in the property to succeed on their conversion claim, they have failed to show a likelihood of success on the merits.

### CONCLUSION

For the foregoing reasons, the Court denies both motions.


Signed July 29, 2014.

David C. Godbey
United States District Judge

ORDER – PAGE 23